# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SIDNEY LAW,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:13-cv-2267-JHH** |
| **AETNA LIFE INSURANCE CO.,** | ) | |
| **DEFENDANT.** | ) | |

## MEMORANDUM OF DECISION

The court has before it Cross-Motions for Judgment on the Administrative Record (Docs. # 14 & 15).[1]  Pursuant to the court's November 17, 2014 order (Doc. #17), the motions were deemed submitted, without oral argument, on December 10, 2014.  After thorough review of the briefs and administrative record, the court concludes that summary judgment is due to be granted in favor of Defendant Aetna Life Insurance Company for the reasons explained below.

## I. Procedural History

Plaintiff Sidney Law commenced this action on December 17, 2013 by filing

---

[1] The court also has before it Plaintiff's Motion (Doc. # 18) to Strike.  Because the court concludes that Aetna's decision was correct and does not have to consider the objectionable evidence, the Motion (Doc. #18) to Strike is **MOOT**.

a Complaint (Doc. #1) in this court against Defendant Aetna Life Insurance Company. Plaintiff's Complaint set forth only one cause of action: wrongful denial of disability benefits in violation of the Employee Retirement Income Security Act of 1974, as amended, (ERISA), 29 U.S.C. §§ 1001, et seq. Defendant responded with an Answer (Doc. #4) on February 14, 2014. On October 31, 2014, the Cross-Motions for Judgment on the Administrative Record (Docs. # 14 & 15) were filed. Defendant's Motion (Doc. #15) for Judgment asserts that the Aetna's determination that the plan at issue excluded coverage for Plaintiff's alleged disability that was contributed to by a pre-existing condition was correct, and, even if incorrect, it was not arbitrary and capricious. Plaintiff's Motion (Doc. #14), however, contends that Aetna's "denial of his disability claim was de novo wrong and arbitrary and capricious, and that he is entitled to disability benefits in the amount of $2,283.93 per month from April 27, 2013 for the first 24 months under the plan, and that Aetna must place Mr. Law on disability status at least until the 24 months disability definition ends." (Doc. #14 at 1.)

Both parties have filed briefs and submitted evidence in support of their respective positions. Plaintiff submitted a brief (Doc. #14) and evidence[2] (Doc. #16)

---

[2] Plaintiff submitted the following evidence under seal in support of his Motion: medical records; long term disability plan at issue; short term disability plan payment records; Aetna claim file records; Aetna letter dated 4/4/2013; Aetna letter dated 5/17/2013; Law letter dated

in support of his motion on October 31, 2014.  On December 3, 2014, Defendant filed a brief (Doc. # 23) in opposition to Plaintiff's Motion, and on December 10, 2014, Plaintiff filed a brief (Doc. #24) in reply.  On October 31, 2014, Defendant submitted a brief and evidence[3] (Doc. # 15) in support of its own Motion for Judgment on the Administrative Record.  On December 3, 2014, Plaintiff filed a brief (Doc. # 22) in opposition to Defendant's Motion, and on December 10, 2014, Defendant filed a brief (Doc. # 25) in reply to Plaintiff's opposition.

## II. Findings of Fact

### A.  The Plan

Long term disability (LTD) benefits under the Plan are funded by Group Policy No. GP-511745-GI ("the Group Policy") which was issued by Aetna to Walpole, Inc. (Def. Exh. 2).  Plaintiff was employed by Walpole, Inc. as a truck driver and was a participant in the Plan.  (Admin. Rec. at CL000246, 258, 296.) The Group Policy confers Aetna with  discretionary authority to determine whether and to what extent

---

6/10/2013; Aetna letter dated 7/24/2011; physician review report by Kathryn Ko, MD, contract between MES Solutions and Aetna and statement of payments to MES Solutions for 203; physician review report by Wendy Weinstein, MD, contract between Wendy Weinstein and Aetna, and statement payment to Wendy Weinstein for 2013; information packets supplied to Dr. Ko and Dr. Weinstein by Aetna; Aetna letter dated 8/15/2013; letter from counsel for Law to Aetna dated 9/6/2013; Aetna letter dated 10/24/2013; Aetna LTD Pre-Existing Conditions P & P manual; answers to interrogatories and document request by Aetna.

[3] Defendant submitted the following evidence in support of its Motion: affidavit of Debra Comar with exhibits; the Group Policy; and the administrative record.

eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other documents incorporated therein." (Def. Ex. 2 at GP000016.) LTD benefits are payable under the Plan to eligible participants who are "disabled" as defined by the Plan booklet-certificate. (Admin. Rec. at CL000186.) The booklet states as follows regarding "pre-existing conditions":

> A pre-existing condition is an illness, injury or pregnancy-related condition for which, during the 12 months before your coverage or increase in coverage became effective:
>
> •     You were diagnosed or treated; or
> •     You received diagnostic or treatment services; or
> •     You took drugs that were prescribed or recommended by a physician.
>
> The Plan does not pay benefits for a disability that is caused, or contributed to, by a pre-existing condition, if the disability starts within the first 24 months after your coverage goes into effect.

(Id. at CL000189.)

## B.  Plaintiff's Medical History, Spine Surgery and Short Term Disability Claim

Plaintiff has a long history of problems with back pain.  On July 12, 2011, Plaintiff saw Dr. Katherine Moore.  (Id. at CL000305.)  Plaintiff reported to Dr. Moore that he had chronic back pain, which required pain medication three or four times per year, and brought Lortab pills with him that were dated 2009.  (Id.)  Dr.

Moore prescribed Plaintiff Lortab for "arthritis." (Id.) Plaintiff filled prescriptions for hydrocodone and methocarbamol in July, August and October 2011. (Id. at CL000270-71.)

On December 4, 2011, Plaintiff went to see Dr. Dallas C. Wilcox, Jr. due to a cut on his arm and requested a tetanus shot. (Id. at CL000278-79.) Plaintiff reported to Dr. Wilcox that he fell and injured his back. (Id.) Dr. Wilcox noted "[m]oderate spasm of the lumbar area," and he gave Plaintiff a prescription for Robaxin. (Id.)

On September 17, 2012, Plaintiff saw Dr. Charles H. Clark III for pain in his back. (Id. at CL000137-38.) Dr. Clark noted Plaintiff's "long history of back pain." (Id. at CL000153.) Dr. Clark stated that the pain "radiate[s] to both hips intermittently. Activity and weightbearing exacerbates the pain." (Id.) Past treatment included "epidural blocks" which "have provided temporary relief." (Id.) Plaintiff also complained of chronic neck pain and right shoulder discomfort, but "no clearcut radicular symptoms." (Id.) Dr. Clark also noted that Plaintiff had been prescribed Robaxin and Lortab by another physician. (Id.) Dr. Clark diagnosed Plaintiff with "[c]ervical and lumbar spondylosis[4] with stenosis in the lumbar region."

_____

[4] "Spondylosis refers to degeneration of the spine. . . . Most often, the term spondylosis is used to describe osteoarthritis of the spine, but it is also commonly used to describe any manner of spinal degeneration." Spine-health, http://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means (last visited January 16, 2015).

(Id.)  Dr. Clark ordered a lumbar and cervical myelogram[5] and post myelogram CT scans.  (Id. at CL000138.)  Dr. Clark's notes stated that the tests revealed as follows:

> bilateral pars defects at L5 with grade 1 spondylosis.  HE also has severe foraminal stenosis bilaterally at L5-S1.  I feel this explains his bilateral hip pain.  There is also disc degeneration at C5-6 on the cervical study.  No cervical stenosis is noted.   The lower back symptoms are worse.

(Id. at CL000153.)

After review of the tests and "[d]ue to long-standing pain  unresponsive to conservative treatment," Dr. Clark recommended the "possibility of posterior interbody fusion with pedicle screws and lateral mass fusion L5-S1."  (Id.)  Dr. Clark discussed the procedure with Plaintiff, including the risks and benefits, and Plaintiff wanted to go ahead with the surgery.  (Id.)

Plaintiff's last day of work was on October 29, 2012, and, on October 31, 2012, he underwent a lumbar interbody fusion procedure.  (Id. at CL 000150-53, 311.)  Following the surgery, Plaintiff submitted a claim for short term disability (STD) benefits.  (Id. at CL000329-43.)  The claim was based on a diagnosis of lumbar spondylosis resulting in "severe [lower back pain] that radiates both hips

---

[5] "A myelogram is a diagnostic imaging procedure done by a radiologist. It uses a contrast dye and X-rays or computed tomography (CT) to look for problems in the spinal canal, including the spinal cord, nerve roots, and other tissues."  Johns Hopkins Medicine, http://www.hopkinsmedicine.org/healthlibrary/test_procedures/orthopaedic/myelogram_92,p076 70/ (last visited January 16, 2015).

intermittently." (Id.)  Plaintiff's anticipated return to work was 3 to 12 weeks post-surgery.  (Id.)  Plaintiff was initially approved for 91 days of STD benefits, beginning October 29, 2012.  (Id. at CL000402.)

In a January 16, 2013 letter, Dr. Clark stated that Plaintiff was "under his care and [would] be out of work until further notice."  (Id. at CL000237.)  Handwritten diagnoses of "lumbar spondylosis" and "cervical spondylosis" were included in the letter.  (Id.)

About a month later, and approximately three and a half months after surgery, on February 15, 2013, Plaintiff saw Dr. Clark again and stated that although his "[l]eft leg pain ha[d] improved from the preoperative status," Plaintiff continued to have "significant lower back pain intermittently extending to his hip and lateral thigh." (Id. at CL000157.)  Dr. Clark ordered a lumbar CT scan, and it showed the following: (1) "sclerosis along the inferior endplate of free L5, overlying the anterior part of the disc spacer bilaterally"; (2) spondylosthesis at the L5-S1 disc level that remained "unchanged"; (3) a bulging disc at L4-L5; and (4) "a mild degree of bony canal stenosis" at the L3-L4 level.  (Id. at CL000158-59.)

On March 7, 2013, Dr. Clark noted that Plaintiff continued to have "left hip and lateral thigh pain" and that there "appears to be a small osteophyte in the left L5-S1 neural foramen encroaching on the L5 nerve root."  (Id. at CL000160.)  Dr. Clark

7

stated that he would refer Plaintiff for a transformational block at L5-S1 on the left, and if that did not provide relief, he would "see him again for consideration of foraminotomy[6] at L5-S1 on the left." (Id.)  On March 20, 2013, Plaintiff underwent a left L4-L5 transforaminal epidural steroid injection.[7]  (Id. at CL000161.)

Plaintiff returned to Dr. Clark on April 22, 2013, and he noted that Plaintiff was "improved after lumbar epidural block," that there was no significant hip and leg pain, and that Plaintiff's primary complaint was "posterior cervical pain."  (Id. at CL000163.)  Dr. Clark reviewed Plaintiff's cervical myelogram done on September 27, 2012, which showed C5-6 spondylosis and degenerative disc disease, and suggested a "cervical epidural block at C5-6 since this [was] now the main symptom." (Id.)  In a form written the next day, Dr. Clark stated that Plaintiff was "still in [the] recovery phase of lumbar fusion surgery on 10/31/12," diagnosed Plaintiff with "post op lumbar fusion/continued pain," and estimated Plaintiff's return to work date as May 31, 2013.  (Id. at CL000288.)

---

[6] "A foraminotomy is a decompression surgery that is performed to enlarge the passageway where a spinal nerve root exits the spinal canal. The term foraminotomy is derived from the medical term for a hollow passageway—foramen. The latter half of the term foraminotomy—otomy—means to open."  Spineuniverse, http://www.spineuniverse.com/treatments/surgery/foraminotomy-taking-pressure-spinal-nerves (last visited January 16, 2015).

[7] Based on all of the above, Plaintiff's STD benefits were extended four times.  (Admin. Rec. at CL000402, 407, 413, 417.)  Plaintiff exhausted his STD benefits on May 5, 2013.  (Id. at CL000417.)

## C. Plaintiff's Long Term Disability Claim, Denial and Appeal

On March 21, 2013, anticipating the exhaustion of his STD benefits, Aetna notified Plaintiff that it was going to evaluate his eligibility for LTD benefits. (Id. at CL000074.) During a telephone interview on March 28, 2013, Plaintiff stated that his back condition was not related to any injury and "his symptoms started developing over the years." (Id. at CL000029.) Plaintiff reported to Aetna that he had a bone spur that was aggravating and causing nerve pain, and although he continued to have back pain, it was getting better every day. (Id.)

On March 25, 2013 and again on April 2, 2013, Aetna wrote to Plaintiff's employer, Walpole, Inc., seeking confirmation of several dates, including Plaintiff's last scheduled day of work, his first date of absence from work, and that date he was eligible to enroll for LTD under the Plan. (Id. at CL000308.) Walpole replied on April 4, 2013, and stated that Plaintiff enrolled for LTD coverage on February 1, 2012.[8] (Id. at CL000307.)

After receiving that information, on April 4, 2013, Aetna sent Plaintiff a letter regarding his LTD claim. (Id. at CL000106.) Aetna stated that it was conducting a pre-existing condition investigation since his claim was asserted within 24 months

---

[8] Plaintiff was actually eligible to enroll for LTD coverage in February 2009, but he did not enroll until February 1, 2012. (Admin. Rec. at CL000307.)

9

of his effective date of LTD coverage.  (Id.)  Aetna reviewed all the medical documents discussed in Section II. B. during this review.

By letter dated May 17, 2013, Aetna informed Plaintiff that his LTD claim was denied under the pre-existing condition exclusion in the Plan.  (Id. at CL000250-51.) Aetna determined that (1) Plaintiff's disability was contributed to by a pre-existing condition for which he was diagnosed or treated, or for which he received diagnostic or treatment services, or for which he took prescription drugs in the 12 months before his LTD coverage became effective, and (2) his disability started within 24 months after his LTD coverage went into effect.  (Id.)  Aetna noted that Plaintiff's LTD coverage became effective February 1, 2012, and Plaintiff became disabled on October 29, 2012.  (Id.)  Therefore, the "look-back" period for Plaintiff's LTD claim was February 1, 2011 through January 31, 2012.  (Id.)

In explaining its denial decision, Aetna cited the medical records from Drs. Moore and Wilcox, noting that Plaintiff reported back pain and back spasms in July 2011 and December 2011, and that both doctors prescribed medicine to treat the condition.  (Id.)  Aetna also cited pharmacy records, emphasizing that Plaintiff was prescribed Robaxin and hydrocodone in July and October 2011.  (Id.)  Based on this information, Aetna concluded that the condition for which Plaintiff was claiming disability – lumbar spondylosis with subsequent lumbar fusion surgery – was

contributed to by his pre-existing condition of chronic back pain. (Id.)

Plaintiff appealed the denial decision by letter dated June 10, 2013, and argued that the visits to Dr. Moore and Dr. Wilcox were unrelated to the back condition for which he had undergone surgery. (Id. at CL000268-69.) Plaintiff admitted to seeing Dr. Moore with "a history of back pain that began earlier in [2011] and had been going on for about 4 months" after he "stepp[ed] out of the truck and into a hole and" fell. (Id.) Plaintiff said that after that incident, he "experienced lower back pain whenever [he] stood for a long period of time, usually over 30 minutes." (Id.) Plaintiff explained that Dr. Moore referred him to an orthopedist, Dr. William Burkhalter, who "took x-rays and ordered an MRI which revealed a fracture in [Plaintiff's] spine." (Id.) Plaintiff further stated that Dr. Burkhalter "immediately removed [Plaintiff] from work and had [him] fitted for a brace," and eventually released Plaintiff to work in October 2011. (Id.)

As for his visit to Dr. Wilcox in December 2011, Plaintiff stated that the visit was for "a slip, not a fall, while working on [his] house," which resulted in a cut on his arm and a pulled muscle in his "upper back and shoulder area." (Id.) Plaintiff insisted that it was "complete[ly] unrelated to the lower back lumbar fusion surgery in October 2012. (Id.) Plaintiff admitted that Dr. Wilcox prescribed "muscle relaxers," but contended they were for "stiffness" in the upper back and shoulder area.

(Id.)

According to Plaintiff, the condition resulting in his surgery began in the "summer of 2012" when he "began experiencing a radiating pain from [his] hip which at times prevented motion and severely limited [his] ability to walk." (Id.) Plaintiff said this pain is what prompted him to seek treatment from Dr. Clark, who "performed tests and discovered the nerves were agitated due to the condition which resulted in the need for the lower back lumbar fusion surgery." (Id.)

After receiving this appeal, Aetna began the review process of its denial. Aetna submitted Plaintiff's medical records for independent review by two physicians – Dr. Wendy Weinstein, a board-certified internal medicine doctor, and Dr. Kathryn Ko, a board-certified neurological surgeon. (See id. at CL000216-19, CL000222-27.) Dr. Weinstein concluded that during the look-back period of February 1, 2011 through January 31, 2012, Plaintiff (1) was diagnosed and treated for chronic back pain by Dr. Moore and Dr. Wilcox, (2) received diagnostic and treatment services by the same two doctors, and (3) was prescribed medications for chronic pain and muscle spasms (Lortab and methocarbamol). (Id. at CL000225-26.)

Similarly, Dr. Ko concluded that during the look-back period, Plaintiff was diagnosed and treated for lumbar spondylosis, received treatment services for lumbar spondylosis, and was prescribed pain medicine (hydrocodone) and a muscle relaxer

(methocarbamol).  (Id. at CL000218.)  More specifically, Dr. Ko explained as follows:

> The claimant has a history of low back pain.  Trauma in the form of lumbar fracture can be contributory to future spine degenerative conditions and lead to surgical intervention such as spine fusion. . . .  Based on these records [and the prescriptions], and in the absence of clarification by the claimant's own spine surgeon[9] it appears that the claimant had treatment for lumbar derangements from 2/1/11 and 1/31/12.

(Id.)

On August 13, 2013, Aetna informed Plaintiff that its LTD benefits decision was upheld on appeal.  (Id. at CL000128.)  Aetna reiterated the contents of Plaintiff's treatment records with Dr. Moore and Dr. Wilcox, as well as the pharmacy records, and emphasized the conclusions of the two independent physicians who reviewed the documents during the appeal process.  (Id.)  Aetna concluded that Plaintiff's "disability of lumbar spondylosis was caused or contributed to by a pre-existing condition" and informed Plaintiff that he had exhausted his appeals under the Plan.  (Id.)

---

[9] Dr. Ko's review was sent to Dr. Clark on August 7, 2013, and his input was solicited. (Admin. Rec. at CL000213.)  Specifically, Dr. Clark was asked to let Aetna know if he disagreed with the conclusions of Dr. Ko, but he did not respond.  (Id.; Id. at CL000128.)  Additionally, Dr. Ko attempted to discuss Plaintiff's condition with Dr. Clark on August 13, 2013, but was informed that Dr. Clark did not conduct peer-to-peer conferences for disability claims.  (Id. at CL000217.)

13

On September 13, 2013, Plaintiff's attorney wrote a letter to Aetna stated that he represented Plaintiff in connection with the appeal and submitted additional records from Dr. Clark and records from Dr. Burkhalter.[10]  (Id. at CL000169-173.) Although Plaintiff's right to appeal was already exhausted, Aetna reviewed the new information.  (Id. at CL000069.)  Its decision did not change.  (Id.)  By letter dated October 24, 2013, Aetna informed Plaintiff's counsel of the affirmance of the decision and reiterated the grounds for the denial.  (Id. at CL000132.)

## III.  Standard of Review

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1132(a)(1)(B)).  ERISA itself does not provide a standard for courts reviewing benefits decisions made by plan administrators or fiduciaries.  Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109  (1989)), but the Eleventh Circuit has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions" in light of recent decisions of the Supreme Court  Id. The steps are as follows:

---

[10] A medical record from Dr. Burkhalter dated June 1, 2012, indicated that Plaintiff presented with right arm pain and shoulder pain, was assessed with a "partial rotator cuff tear", and prescribed anti-inflammatories.  (Admin. Rec. at CL000173.)

14

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Wayton v. United Mine Workers of America Health and Retirement Funds, 2014 WL 2566092 *3 (11th Cir. 2014).  This court's review of Aetna's decision is limited to "consideration of the material available to the administrator at the time of the decision."  Blankenship, 644 F.3d at 1354 (citing Jett v. Blue Cross & Blue Shield,

15

890 F.2d 1137, 1140 (11th Cir. 1989)).

The claimant has the burden of proving entitlement to ERISA benefits. <u>Glazer</u> <u>v. Reliance Std. Life Ins. Co.</u>, 524 F.3d 1241, 1248 (11th Cir. 2008). Plaintiff "bears the burden of proving that [Aetna's] decision is wrong." <u>Id.</u> at 1247. If Plaintiff satisfies this burden, he "then must demonstrate that [Aetna's] decision to deny [his] LTD benefits was arbitrary and capricious; that is, he must show that no reasonable grounds support [Aetna's] decision."[11] <u>Id.</u>

## III.  Analysis

As discussed in detail above, Aetna denied Plaintiff's LTD claim because it concluded that Plaintiff's disability was contributed to by a pre-existing condition. First, the court must decide whether Aetna's decision was correct. If it was, the inquiry ends. If it was incorrect, the court must then go on to the next steps int eh ERISA analysis and ultimately decide whether the decision was arbitrary and capricious.

## A.  Aetna's Decision Denying Benefits Was Correct

The court "looks to the plain language of Defendant's policy" for the definition

─────────────────────

[11] The parties dispute whether the Plan granted Aetna discretionary authority in reviewing claims - Plaintiff contends that it did not and Defendant contends that it did. It is clear from the Plan documents before the court, including both the Group Policy and the Plan booklet-certificate, that the Plan granted Aetna discretionary authority in reviewing claims.

of pre-existing condition and for when it applies to a LTD claim.  See Fath v. Unum Life Ins. Co. of Am., 982 F.Supp 1147, 1151 (M.D. Fla. 1996).  The Plan here provides a specific definition of a pre-existing condition as "an illness, injury or pregnancy-related condition for which, during the 12 months before . . . coverage . . . became effective" one of the following three things have occurred: (1) claimant was diagnosed or treated for the condition; (2) claimant received diagnostic or treatment services for the condition; or (3) claimant took drugs that were prescribed or recommended by a physician for the condition.  (Admin. Rec. at CL000189.) Further, the Plan states that it "does not pay benefits for a disability that is caused, or contributed to, by a pre-existing condition, if the disability starts within the first 24 months after your coverage goes into effect."  (Id.)

"Next, the court reviews Plaintiff's medical history, . . . medical notes and studies" to determine if he was diagnosed with, received treatment for, or took drugs prescribed by a physician for the disabling condition during the relevant period.  Fath, 928 F. Supp. at 1151.  It is undisputed that Plaintiff's date of disability was October 29, 2012, which was within the 24 months after coverage was effective, and the date of effective coverage was February 1, 2012.  Therefore, the 12-moth look-back period was from February 1, 2011 through January 31, 2012.

The evidence in the administrative record before the court is crystal clear that

17

Plaintiff's disabling condition was caused by, or was contributed to, by a pre-existing condition under the terms of the Plan.  Plaintiff claims to be disabled due to back pain from degenerative spinal problems, diagnosed as spondylosis.  In the relevant medical records, Dr. Clark repeatedly notes Plaintiff's "long history or back pain, and on October 31, 2012, due to this "long-standing pain unresponsive to conservative treatment," Plaintiff underwent a posterior lumbar interbody fusion.  Before the surgery, Dr. Clark reviewed a lumbar MRI from a year earlier, indicating "moderate L4-5 stenosis and possible spondylosis."

In July 2011, Plaintiff reported to Dr. Moore that he had chronic back pain that required pain medication three or four times a year, and Dr. Moore prescribed Lortab for "arthritis."  In December 2011, Plaintiff told Dr. Wilcox that he injured his back. Dr. Wilcox noted "[m]oderate spasm of [the] lumbar area" and prescribed Robaxin. Plaintiff was also treated by Dr. Burkhalter in the summer of 2011 for back pain, and he reportedly ordered an MRI showing a fracture of Plaintiff's spine.

From these medical records, it is clear that Plaintiff was diagnosed and treated for chronic back pain and "lumbar derangements," received diagnostic and treatment services for the condition, and was prescribed pain medication for back pain and back spasms during the look-back period.  Each of those, separately and in combination, qualified under the Plan to exclude Plaintiff's disabling condition under the pre-

18

existing conditions provision.

Plaintiff's explanations for his visits to Dr. Moore and Dr. Wilcox are not supported by the medical records.   Moreover, his argument that these earlier treatments for his chronic back pain are somehow separate and apart from his disabling condition have no merit.   The court refuses to separate the two when the medical evidence clearly does not.  There is no evidence in the record to show that the disabling pain was not caused by, or contributed to, these older complaints of back pain.[12]   See Griswell v. Reliance Standard Life Ins. Co., 209 Fed. Appx. 888 (11th Cir. 206) (affirming district court's decision that "because [plaintiff] was treated for the same conditions and symptoms [chronic back pain and degenerative spinal issues] both during the . . . 'look back' period and as part of his treatment in connection with his disability claim, the plain and unambiguous terms of the 'pre-existing condition' provision excluded [plaintiff] from coverage).   Simply put, Plaintiff has not met his burden of proving that Aetna's determination that the pre-existing condition provision precludes his claim for benefits is wrong.  Therefore, the decision must be affirmed.

---

[12] The court rejects Plaintiff's argument that "Aetna mischaracterized the evidence by translating back pain and chronic back pain to lower back pain."  (Doc. # 14 at 20.)  The well-documented degenerative lumbar condition and the long history of back pain leads to the logical conclusion that the back pain and spasms described to Dr. Moore and Dr. Wilcox, for which he took prescription pain medication, and for which ultimately required spinal surgery, are interrelated.

## B.  There are Reasonable Grounds for Aetna's Decision

Under the multi-step ERISA framework, the court's inquiry ends after the court determines that Aetna's decision was correct.  <u>Blankenship</u>, 644 F.3d at 1355. However, alternatively and additionally, the court concludes, consistent with the discussion above, that even if Aetna's decision was wrong (and to be clear, the court finds that it was not), there were "reasonable" grounds in the record which support Aetna's decision.  Because reasonable grounds exist to support the denial decision, it is unnecessary for the court to determine if Aetna operated under a conflict of interest.  Therefore, this court's consideration of Plaintiff's ERISA claim is at its end.

## IV.  Conclusion

Aetna's decision is due to be affirmed.  A separate order will be entered dismissing this case with prejudice.

**DONE** this the   21st   day of January, 2015.

_____

SENIOR UNITED STATES DISTRICT JUDGE